Okay, come on up for the last case. Take your time setting up. It's number 24-11996, Jane Doe et al. versus the Surgeon General of the State of Florida et al. Mr. Gazeel, whenever you're ready. Thank you, Your Honor. May it please the Court, Muhammad Gazeel on behalf of the State Appellants. Regulating gender dysphoria treatments is not to transgender individuals what a ban on yarmulkes is to Jews, the classic example from Bray. But the District Court treated gender dysphoria as a proxy for transgender individuals. That was a legal error. The District Court itself acknowledged that there were valid reasons to regulate treatments for gender dysphoria, as did this Court in Agnes Tucker. Does that mean in your view, Mr. Gazeel, that it can never be a proxy? Whether or not gender dysphoria can be a proxy? It can be a proxy, Your Honor. It can be a proxy if there are no valid reasons whatsoever. If, for example, the science is absolutely conclusive that gender dysphoria can only be treated a certain way and the state is prohibiting those treatments, that would be a proxy. If, for example, in this instance, the State of Florida had said that we are not going to allow for mental health counseling for people who have an incongruence between their gender identity and their sex, that would be a closer case. But again, that's not what the state is doing. And so the question then becomes, okay, are there valid reasons to treat gender dysphoria? The Court specifically says on page 91 of the order that stringent regulation of gender dysphoria would be perfectly constitutional so long as it was done on the merits and not based on animus. And so I think it's wrong then to treat gender dysphoria as a proxy for transgender individuals. That's also especially true, Your Honors, because the record is clear. The plaintiff's experts concede that not all transgender individuals have gender dysphoria. So gender dysphoria is a specific diagnosis. This specific diagnosis has certain treatments. And the State of Florida is saying that people with a specific diagnosis of gender dysphoria, if they're minors, should not get puberty blockers and cross-sex hormones. If people with this specific diagnosis are adults, we're going to put more guardrails to ensure that these treatments are safe and efficacious. And so, Your Honor, that brings me to another point. The District Court also— I think you would agree that if the State of Florida had said, you know, emergency rooms are not going to treat people with gender dysphoria, that that would suggest an animus against people, against transgender people, right? Not that they aren't going to treat the condition, but just that they aren't going to treat people who have broken their legs if you're a transgender, the emergency room is not going to treat you. Yes, Your Honor, because that would be closer to a Romer versus Evan type of scenario, where there are no legitimate state interests whatsoever, where there's a bare dislike of a class of people, so there's no legitimate state interest to justify that kind of treatment. So that would be closer to that example. And that's, again, not what we have here. Right. But do you think that's the standard? I mean, I've always had a difficult time trying to figure out what discriminatory animus really means, necessarily. It seems like it means like the bare desire to harm a class is like the motivating purpose behind the law. Do you agree with that? Or am I wrong about that? Your Honor, I think it's a bit more nuanced than that. So if you have—different ways to animus, right? If you have animus that's a proxy, and I go back to the Jews and yarmulkes example, if the yarmulkes are just a proxy for Jews, and there's no possible valid reason to regulate yarmulkes, then the proxy analysis, without anything more, applies. If we have an Arlington Heights analysis, and we go through that analysis to figure out whether or not there's animus, okay, is there animus that's directed at a particular person on an otherwise facially neutral statute? A statute that says we're going to target judges for retirement based on certain age. If the Arlington Heights analysis says, well, the true reason for that statute was we don't like black judges because all those judges tend to be older, that would be a pretext under the Arlington Heights analysis, and it would trigger heightened scrutiny because race is a suspect classification. Now, in that hypothetical, if the pretext shows that we are just targeting judges because, hey, they happen to be, all the older judges happen to be from rural counties, well, rural isn't a protected class. Even if you have animus there and animus towards rural individuals or people from rural counties, we don't have a constitutional cheat code that the animus automatically triggers heightened scrutiny, and I think that was also part of the problem in the district court's analysis here. The district court went through an Arlington Heights analysis, and it said there was animus directed at transgender individuals. Okay, let's assume for a second that's true. We don't think it is, but let's assume that's true. Then are transgender individuals a quasi-suspect classification? The answer is no, they're not. So animus in and of itself, when there isn't an underlying quasi-suspect class or suspect class, doesn't trigger heightened review, and the district court applied heightened review. That, too, was legal error. Would you need heightened review if you had invidious discrimination as to a non-suspect class? I think you would, Your Honor. I think you would need heightened review for the plaintiffs to prevail in this instance if there was animus directed at a non-suspect class. No, no. I understand your argument about the regulations and statutes here, but I'm not sure that you would need heightened scrutiny to strike down a law against a non-suspect class that was based on invidious discrimination. That might fail the rationality test. So, Your Honor, if I understand this correctly, if we have a situation where we go through an animus analysis, and we discover that, hey, there's a non-suspect class at the end of the case. The state of Florida decides, in its wisdom, that it is going to require lawyers with hair or lawyers without hair to do an extra million things to keep their bar licenses, offers no justification for it whatsoever. Neither you nor I are suspect classes in the world of lawyers, but you wouldn't need heightened scrutiny, it seems to me, to strike down that statute or that regulation because if there's no justification offered for it, it would fail the test of rationality, right? So, you know, in a certain world, you may not need heightened scrutiny if you have invidious discrimination. That's correct, Your Honor. And that would be the Romer example, where there's no possible justification for the state regulating bald lawyers and lawyers with hair differently. But that's not this instance, because in the district court's order, the district court itself recognizes that, look, there are concerns with this treatment, that guardrails are appropriate, stringent regulation is appropriate. Where the district court says the state went wrong is the state was driven by an animus towards transgender individuals and wasn't focused on the more meritorious reasons to regulate this treatment. And there, if we go back and look at what the district court ultimately relied on, the district court relied on the statements of seven or so legislators to paint the entire Florida legislature with a discriminatory animus towards transgender individuals and the two independent boards of medicine. And I think that was wrong. That was an error. Ultimately, at the end of the day, the district court did recognize that there are meritorious reasons for doing this. So we're not in the Romer paradigm or the bald versus, you know, hairy lawyer example. And because that's so, the district court should have applied in its Arlington Heights analysis as it was going through the animus analysis, the district court also should have applied the presumption of good faith. You tell me how you think that operates. It's not, I mean, as I, as I understand it, and you and I have had, you and I have had some history dealing with that presumption in another context, but it's not irrebuttable, right? It is not irrebuttable. There's a world in which you can overcome that presumption, right? That's true. Okay. Tell me how you think that operates in practice. Like, how do you overcome, theoretically, I don't want you to argue against yourself in this case, but how do you theoretically overcome the presumption of legislative good faith when you're dealing with a discrimination claim? Sure, Your Honor. And number one, I make the point that this is a hard presumption to overcome, and as it should be. We go all the way back to Fletcher versus Baldwin, and the brief from the state of Alabama does a good job explaining why that's so. Second, if we were to try to overcome this, Your Honor, I'll give you a couple of examples. Suppose we have a racial gerrymandering case like the one we've had some experience with recently, and it was racial gerrymandering done by a city council, a city council made up of five individuals. If we have direct evidence of the five individuals talking about the reasons why they drew certain lines and saying that this was for race-based reasons, that's one way to overcome it. You've got direct evidence from the five decision makers talking about why this is so. The second example that I highlight for the Court is there's a decision from the Fourth Circuit context called McCorry. There you have the state of North Carolina, they went and they asked for the means by which people chose to vote, the method of voting, broken down by race. The methods of voting suggested that black individuals voted a certain way. Then the North Carolina legislature took that information and targeted those very methods of voting. And that was, as the Fourth Circuit said, with surgical precision, the legislature as a whole was targeting individuals, and so the presumption of good faith was overcome. I also note for the Court that we believe that the presumption of good faith applies. If we're going through the Arlington Heights factors, it applies for every one of those factors. So if for one of those factors you have evidence that goes both ways, Alexander says that we have an inference, it's an evidentiary inference, that you pick the one that sides with the state. And I think that in this instance, if applied correctly here, would mean that if you had the statements from the seven or so legislators, and then you had silence from the remainder of the legislature, the district court said that silence from the remainder of the legislature was something from which the district court could infer that there was bad intent, that there was animus directed towards transgender individuals. We submit that that was error. If you have silence from the majority of the legislature, that means that, hey, the majority of the legislature may have focused on the other bases for regulating this. Same thing with the boards of medicine. The district court focused on the boards of medicine and their informed consent forms. There are two possible rationales for why the informed consent forms were written the way they were. One is there was animus towards transgender individuals to make this as hard as possible. Two, this was a product of group writing done in open meetings because that's the only way these boards can meet. They can only meet as a collegial body in a formally noticed meeting. We included vignettes of this on pages 20 and 21 of our briefs. And this is dense conversation going on between doctors, lawyers, policymakers, and you get the form that you get. And those are concrete examples of how the presumption of good faith should have applied. Now, had the court applied the presumption of good faith appropriately using the Arlington Heights test and concluded that there was animus towards transgender individuals, we think that would have been wrong. But let's assume the court properly applied the presumption of good faith and concluded that there was animus towards transgender individuals. The court then said that because there was animus directed at transgender individuals, the court was going to apply heightened scrutiny. The court had four different ways to get to heightened scrutiny, one of which was animus. It said animus was left open by Echnus Tucker as a basis to apply heightened scrutiny in throughout the state's actions. And the court then relied on that animus analysis to trigger heightened scrutiny to strike down Florida's law. The problem is, because there's no quasi-suspect classification underlying that direction of animus, the application of heightened scrutiny was in error. Your Honor, I see I'm into my rebuttal time. I have one final question for you, and I'll ask your opponent on the other side the same question. Should we wait for further legal developments from the Supreme Court before deciding this case? I mean, you have a stay, right? So the state of Florida is not being harmed at the moment by the district court's order in a practical sense. I know the judgment is there. And so I'm wondering whether or not it makes sense to wait at least a little while and see what, if anything, happens. Your Honor, as a practical matter, the answer is yes. And Scarametti deals with what level of scrutiny to apply. And as Judge Hinkle points out, his conclusion would be more rooted on firm ground had heightened scrutiny applied. So I think that yes, Your Honor, practically speaking, the answer would be it makes sense to wait for the decision in Scarametti on what level of scrutiny applies to a classification such as this, because Florida's law is nearly identical to Tennessee's. Okay. Thank you very much, Mr. D'Azio. You've saved your time for rebuttal. Mr. Unikowski. Thank you, Your Honors. May it please the Court. In Eknist-Tucker, this Court held that the regulation of a course of treatment that only gender nonconforming individuals can undergo would not trigger heightened scrutiny unless the regulation were a pretext for invidious discrimination against such individuals. In this case, the District Court faithfully applied that legal standard and did not clearly err in concluding that the challenged rules and statute were the product of animus. The District Court applied the presumption of good faith and concluded based on the particular and unusual facts of this case that, according to the District Court, the record shows beyond any doubt that a significant number of legislators and others involved in the adoption of the statute and rules pursued an illegitimate interest. Well, didn't you just have a few legislators that made those comments that you're referring to? Yes, Your Honor. There is, I think the count is approximately seven, but that wasn't the only thing the District Court relied upon. So if I can just say two things about the legislators. So first of all, Arlington Heights expressly instructs that the Court should consider statements and actions of key legislators as one part of the evidentiary picture. So I don't think that the District Court erred in applying that factor. Second, with respect to those legislators, the arguments regarding the statements of legislators are far stronger than in prior cases from this court in which Arlington Heights challenges were denied. If you look at the League of Women Voters case, for example, it's like one ambiguous statement from one senator. Here you have numerous statements from multiple legislators at the hearing on this specific bill. But I do understand the concern about imputing the motives of, you know, seven people in the House to the entire legislature. I don't think the District Court did that. I think it considered that as one piece of circumstantial evidence in the overall evidentiary picture alongside other types of circumstantial evidence. So for example, I think recognizing concerns about focusing on individual legislators, the District Court also focused on other contemporary statutes that could be attributed to the legislature as a whole because the legislative body voted for them. So for example, the District Court pointed to a statute that was signed into law the same day, which I understand is the subject of a pending appeal before this court. But it's a statute in which Florida expressed its view that, you know, the use by a teacher of a pronoun that's opposite to the person's natal sex is false and that teachers are prohibited in schools from using those pronouns. And what the District Court inferred from that was that the legislature's goal was to deter people from transitioning. It felt it was hostile to the concept of people transitioning. It just didn't want people to do that. And so the District Court inferred that that was at least one of the motives underlying – yes, Your Honor. I think that's right. I mean, I think when you take this sort of the legislator comments out of it, what the District Court was sort of saying was that the state's preference for people not to transition or the state's, I don't know how you might say it, sort of wanting to sort of put the thumb on the scale against transition is equivalent to animus. Is that right, though? I mean, I guess I'm just having a conceptual problem seeing that, seeing that. Yeah, I think it is right. So first of all, the state, the District Court repeatedly points out that the state hasn't defended that interest as a basis for its legislation. I think what the District Court was saying is that, you know, transgender people who transition shouldn't exist. Maybe not shouldn't exist. Maybe that's too strong. But that it's the proper role of government to deter people from doing that. So if the government says teachers who transition lose their jobs, I think that's an expression of hostility towards that group, and it's an expression of the state's view that people should be deterred from taking that step. And I think it was – I'm sorry, Your Honor, did you have a question? I just – I think in this context, I guess, I guess I'm having a conceptual problem with this context. So, like, so in – this is particular with the District Court's analysis of the forms. So the District Court says, you know, one evidence of discriminatory animus here is that the forms don't – I'm not quoting, but sort of like correctly identify the benefits of transition when they're making this disclosure. But why can't the state have the view that it's a bad idea to have this health care or that it's at least like something that the state should say, you know, we think this is – there are other forms of treating gender dysphoria and we prefer those to transition? I guess I'm having – why is that view that the state, I think, pretty clearly has, why is that animus? Well, I guess – so first of all, the state – I don't think the state has defended that position, Your Honor. But why is it – and I think it's expressing the view that a certain class of individuals just shouldn't exist. The class of individuals who have completed a transition, including both social and medical transition, the state believes that that group of people shouldn't exist, should be deterred from transitioning, and should leave the state. But if that were the case, then any – I mean, I guess – and this goes to Judge Jordan's question about Schermetti. If that's the case, then obviously a law that bans, you know, transition medications for some class of people would be motivated by discriminatory animus, right? I don't think that's the case. It would be an exact overlap. No, I don't think that's the case. Because I think the distinction the district court was trying to draw was between laws that were motivated by a genuine concern about effectiveness of medical treatment and a law that's motivated by just a bare desire for people not to transition. So suppose the legislature looked at the relevant evidence and said, look – So you could say – so the legislature could be motivated by a desire to prevent people from transitioning as long as there's some other backing for that. So we want people to not transition because we think that this medical care is a problem, or we want people to not transition because we think that, you know, this is an over-prescribed method of treating gender dysphoria, or whatever. There has to be some because there. Is that what you're saying? That's how I interpret Agnes Tucker. So Agnes Tucker seems to be saying that it's rational for the legislature to say, look, there's a lot of studies, but the studies are of low quality. I don't want to argue against myself, but that's how I interpret the Agnes Tucker case. That there may be issues of bone density and things like that, and it's just not clear what the long-term outcomes are, and so therefore we don't think this is medically indicated. Agnes Tucker holds that that's a rational basis, or at least it's likely to be a rational basis that was a preliminary injunction case. Now the district court in this case disagrees with those findings, but Agnes Tucker is binding a circuit precedent. We're obviously not fighting that. What the district court did here is distinguish between a law that's motivated by a medical justification, like these treatments are just bad for children, and they make them less healthy rather than more, and a law that's motivated by just a bare desire for people not to transition. It would just be better in the view of the state of Florida if people had secondary sex characteristics corresponding to their natal sex. That's an interest that the district court characterized as reflective of hostility towards a group of people, and it's an interest the state hasn't defended. I think on this record, it's just clear that at least many legislators were motivated by that view. It's very clear from these forms. When the forms just take out all reference to the benefits, all reference to the risk of not having care, it transforms the forms into an advocacy document trying to persuade people not to transition, as opposed to what an informed consent form is supposed to be, which it... Go ahead, Your Honor. Could I ask you to pivot over for a second to the issue of the legislative presumption of good faith? It seems to me, reading the district court's order on its face, that the district court took account of legislative, the presumption of legislative good faith, and then found that it was overcome. But the Supreme Court's decision in Alexander in a different context seems to give that presumption steroids. And so I'd like your response to that sort of open-ended question about how you treat the presumption of legislative good faith in a case like this one. So if I can make a couple of points about the Alexander case. So first of all, I think the court's language was made in the context of talking about racial gerrymandering claims. The court's concern in Alexander is that in almost every case, a gerrymander could be thought of as both a racial gerrymander and a partisan gerrymander. And it's very easy, especially in cases where voting is racially polarized, to attack the legislature for having gerrymandered based on race. And so the court was especially concerned about hurling accusations of that nature. And that's why there's a very strong language in Alexander that, you know, if there's any plausible reason to believe it's a partisan gerrymander, that's how the court should rule. Second, I think that even taking account that legal standard, the district court's language in this case is quite, quite strong. At one point, it says there's overwhelming evidence that at least the House sponsors and a significant number of other members were motivated by animus. Elsewhere, it says the record shows beyond any doubt. So I think the district court recognizes that an extraordinary showing was needed. And it just found, based on its review of the factual record here, that the showing was made. And maybe just one other point about that, the state argues that under Alexander, like every single individual subfactor has to be analyzed with this anvil on the scale on one side. There's certainly nothing in Alexander that says that, nor is there anything in any of the other presumption of good faith cases from the Supreme Court. Generally, those cases say things like you can't just assume that a legislature is acting in a racist way merely based on a racist past. That's how the presumption usually comes up. Like, you know, there's a there's a law that comes out of Alabama or Florida or something like that. And the plaintiffs say, well, you know, you can point to de jure discrimination many years ago and you can just assume the legislature must have been acting in a racist way unless proven otherwise. And the Supreme Court has repeatedly said, no, that's not a permissible assumption. Legislatures are entitled to good faith and they can't be tainted by by the sins of the past. But the district court here didn't do anything close to that. I think the district court was laser focused on what this particular legislature did, both in this bill and in other bills enacted the same day. And so I think the legislature, sorry, the district court applied the presumption faithfully. I didn't mean to interrupt the rest. No, I could just make one or two other comments and then I will sit down. I want to address a couple of the statements, a couple of the reasons that were given in the state order. So the panel, the state panel concluded that the district court erred because it applied a kind of mixed mode of analysis. The district court did acknowledge that a significant number of House members were motivated by reasons other than animus. But then it concluded that a majority of both houses and the governor would not have reached the same conclusion absent the discriminatory motive. So on this, I think the district court was absolutely correct. It was faithfully following Supreme Court precedent. There's this whole discussion in the Arlington Heights case about this exact issue. So Arlington Heights says, rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern. And so acknowledging that point, both because individual legislators may have multiple motives. Also, there's lots of people in the legislature who may have different motives. And so it's very well that when there's proof of a discriminatory purpose has been a motivating factor, deference is not justified. And that's subject to a same decision defense as this court or as the Supreme Court articulated in Hunter versus Underwood. So I think the district court's analysis where it found animus and then it also recognized that, you know, genuine bona fide concerns about health may have motivated the legislature's actions, at least in part. And then it conducted the same defense, same decision defense analysis is exactly what the Supreme Court has said that that it should do. The second thing that yes, it's just slightly different. But what does the what is the argument for animus on the part of the medical board? I get the the statements of the legislature and that nature on on that aspect of it. But medical board, it seems like what the district court really was just pointing to the absence of the benefits being expressed plainly in the form. Is there something else besides that? Yeah, I think the district court pointed to a few things. So one is what you just articulated. Second, the district court pointed to statements that were frightening and seem to be included for no reason, like statements about drugs that weren't even used in the United States. Third, there's a number of requirements that were imposed by the board that the court felt didn't make any sense and showed animus. For example, the board's required as part of the informed consent process to have bone density scans, even for people who are only on testosterone, which doesn't doesn't reduce bone density. The court felt that, you know, these were slapdash provisions that were intended to deter care and increase costs. The board also expressed concern about the process at the boards or the district court talked about how the boards invited only people from one side. There's evidence in the record that the board pre filled out these speaker cards for people only on one side of the debate. And that's what the district court was talking about when it refers to inviting people away from one side of the debate. So there was some concern about the process, but I think by and large, the district court's concern about the board was the content of the consent forms. So I guess so this goes back to my original question, which is just trying to figure out what exactly discriminatory animus means in this context. But if the board had done all that and it was a slapdash sort of effort and they, you know, they had made these mistakes in the forms and whatnot, but they were motivated by the genuine concern that this care is bad and that, um, people should in fact be deterred from getting it. Is that, didn't we agree that that was not discriminatory animus? No, it depends on why we think it's bad. If the state just thinks people just shouldn't transition, just philosophically, it's bad to be transgender. You know, if you're born one way, you should die that way. And that's how they believe just as a matter of philosophy. So I think that that is redolent of animus towards the group of people who transition. And it's an interest the state hasn't defended. But on the flip side of that though, I think, I think, I thought we agreed that if, if like a person on the medical board thought this is not the right way to treat gender dysphoria, this is a serious problem. I've read some studies somewhere that says this is a serious problem. This is a bad idea and it's overprescribed. And so we need to make it harder for people to get this. So yeah, I, you're right, district court, I am just making this hard. I'm making them get bone density scans they don't need. Stuff like that. Does any of that matter if the, if the motivating, if the thing that motivated the person on the medical board was that they thought they were doing a good thing? I don't think so because these forms were enacted pursuant to a statutory obligation to enact informed consent forms and informed consent, I think doesn't mean just skewing the forms. So the states or the board's preference on how people should proceed should be implemented. I think informed consent means a fair description and that way people will be informed and can make their own personal decisions. And so I don't think that the, the, the, the forms are consistent with that and they're more consistent with just a view that people shouldn't transition. I see my time. Sorry. Same question I asked Mr. Jazeel. Do we wait for the Supreme Court at least with regards to the appropriate standard of review? I mean, our perspective is the court should adjudicate this appeal and if the Scarametti case comes out, you know, in favor of the justice department, then we could either file a re-hearing petition or, or, or cert petition or maybe we wouldn't have to if the court affirms anyway. I don't think, um, I don't think that, uh, the outcome of that case will necessarily affect this one because the district court assumed Agnes Tucker was correct, uh, as part of its analysis. Yeah, but do you think, I mean, and I, I mean, I'm not trying to make you divine the mind of the district court, but do you think the district court would have reached this result had the Supreme Court said that exactly the same law was constitutional in Tennessee? I, I, I think that's what the court is saying in this very case because, I mean, the court acknowledged that Agnes Tucker was binding circuit precedent. Yeah, but at the time the district court entered its opinion, Agnes Tucker was, there was a en banc petition pending. I mean, it just seemed like the district court was just trying to find a way around Agnes Tucker on the idea that it might not be the law. I, I, I don't read the district court's, I mean, I can't divine. Yeah, I mean, I guess, I guess that, that just seems like maybe a reason we should wait for the Supreme Court to rule is that I'm not even sure the district court would have reached this result. I just think, I mean, I, I can't predict the Supreme Court, but even if the court holds exactly what this court held in Agnes Tucker, that wouldn't undermine the district court's conclusion that even if rational basis review ordinarily applies, you have cases like Romer and city of Cleburne that say that we treat laws based on animus differently, even when we're talking about a non-quasi suspect class. That's how I understand the district court's reasoning. I don't think that would be affected by a ruling in favor of Tennessee and Scrimeti. Of course, if the United States wins Scrimeti, then there's an additional reason we would prevail in this case. Okay. Thank you very much. A police court. I'd like to focus on three broad points and flesh them out a bit. Uh, first, the notion that the state's position is that people shouldn't transition, that's simply incorrect. This case is moving through this court together with a companion case, Decker, whose record is part of the record of this case. In Decker, the state made clear that for Medicaid purposes, the state is reimbursing, uh, treatments that help people with their, uh, emotional distress because of the transition. The state is providing mental health services for people who are transitioning so that they can, uh, feel better about the, uh, incongruence, uh, between their natal sex. I mean, it's definitely the state's position that children shouldn't transition, right? I mean, it's banned. So, I mean, it may not be that they shouldn't transition because of, like, as Mr. Nikoski says, kind of philosophical reason, but I mean, it may be for a health reason, but I mean, it's the state's position that you can't do that in Florida, right? Well, no, your honor. The state is continuing to, uh, cover these services for children too if what they're choosing to do is to explore a different gender identity. So that is covered under the state's Medicaid program. The prohibition in the state statute says that if you are diagnosed with gender dysphoria, the incongruence, uh, the distress caused by the incongruence, then you cannot get puberty blockers and cross-sex hormones. So except the, uh, you're, you're, you're, so the state is provide, I don't mean to make light of it, but the state is providing mental health resources through Medicaid reimbursement for kids who are prevented from undergoing the treatment that they and their parents want to undergo and are suffering mental distress as a result. Yes, your honor. Medicaid, Medicaid includes a long schedule and your honor, that makes rational sense because if you look at the endocrine society guidelines, the endocrine society guidelines talk about how children when they're exploring their gender identity are more likely to revert back to their natal sex and the disalignment is going to align itself again. So your honor. Isn't the fight here just all over whether this is good treatment or bad treatment? I mean, I guess that's, I guess that's the issue it seems to me is that the, the district court said, this is, this is the state of Florida wanting to make it so people can't get this treatment because the state of Florida hates these people and has a philosophical disagreement with the idea of transgenderism. And the state of Florida is saying, we are concerned with this treatment. We think it's generally a bad treatment and we think that the right thing to do is not treat these people with, um, hormones and, um, surgery. It's to do something else like mental health care. Exactly. Thank you, your honor. And the state of Florida doesn't need to be right. The state of Florida is putting forward the fact that it has concerns about these treatments. Now, whether or not it's right, maybe fleshed out down the road as we get more, uh, longitudinal studies, et cetera. Uh, your honor, I'd like to also talk about the presumption of good faith. Um, number one for the presumption of good faith, we're talking about seven members, mostly from the Florida house and the district court on page 51 of the order talks about how it's from those seven house members and the silence of the others that the district court is inferring that there was animus directed as transgenders elsewhere in the legislature, which is bicameral. So we have a Senate and that says nothing about the independent boards of medicine, which are separate entity, independently appointed. And your honor, I note for the separate boards of medicine, my friend may have gotten this wrong from the record and he did a PX 75 includes an invitation list of people that they'll boards invited to speak at their board meetings to the boards, uh, collaborated with equality Florida and interest group on the other side to invite many of the plaintiff's trial experts to board hearings, to provide their perspective on these treatments. Uh, your honor, I also evidence that evidence isn't determinative. I mean, you could, you could, I'm not saying this happened in this case, but you could try to have a completely open and nonjudgmental hearing process and use that as a mask for discrimination at the back end. Like, Hey, let's make this look good. We're going to invite everybody. We're going to be completely open. Everybody gets all the time they want to speak and present and all of this. And now we're going to have all these descending viewpoints and person, but then at the end of the day, we've made it look okay. And then we're going to do what we're going to do. I'm not saying it's not relevant and I'm not saying it's important, but it doesn't answer everything. I agree your honor. But the distinction between what you just said and what I just said is what I said is in the record. It's PX 75. What you said is nowhere in the record. No, no. And I preface my, my statement with that. I'm not trying to comment on the record in this case. And then DX 14 are forms that the state, the executive branch submitted through its experts, Dr. Levine to the boards of medicine, their revisions to the informed consent forms and to prove that the boards are no one's lackey. They never took those on a final point. Your honor. I think this is important. I think the district court and my friends on the other side, misconstrued Eknis Tucker. Eknis Tucker says, as it's talking about what level of scrutiny to apply, the regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny unless the regulation is a mere pretext designed to affect an invidious discrimination against members of one sex or the other. There the Eknis Tucker is quoting from Dobbs, which is quoting from Godaldig. Nothing in that statement says that we apply heightened scrutiny if there's no quasi suspect or suspect class. Both Godaldig and Dobbs were talking about whether or not the restrictions there were pretext to target women, which is a sex based discrimination, a quasi suspect. You interpret that and then we'll close with this because you're over your time, but you interpret that language from Eknis Tucker is saying that the only time you might trigger heightened scrutiny is if you prevent these transitioning medications and treatments and procedures to one sex determined by gender at birth. So if the state of Florida said no transitioning female to male and I'm summarizing those concepts, but the other one's okay. You interpret Eknis Tucker is saying that's a problem. That's an equal protection problem. It may not be insurmountable, but you get heightened scrutiny. I think that's a fair way to read it because otherwise we're creating again, your honor, a constitutional cheat code. So I think, I think if that's, if that's, I mean, if that's right, then you would suggest that the state of Florida could say, look, we want to make sure there aren't any transgender people in Florida. So we're going to pass a law that says, you know, you can't enroll in the University of Florida or Florida state or any college unless your gender identity matches your, um, your birth sex. Would that not be like animus towards those people and subject that to some kind of, some kind of heightened scrutiny? Your honor, I think just conceptually that, that, that law would be thrown out, but it would be a lack of rational basis. Yes, your honor. There's no legitimate government, but I mean, rational basis is so easy to surmount. You don't think you could surmount that? I mean, the state could say that we've found that those, that, that having a transgender individuals in classes, you know, it's just disruptive to the learning environment. I mean, there's so many ways to develop a rational basis for a law like that. And there are ways to test it to your honor. And so I would submit that again, Romer is the classic example where the court chose not to apply some kind of heightened scrutiny and came to the conclusion that the law should have been thrown out regardless. And judge Hinkle to his credit makes the point, the rational basis can have teeth and he goes through the types of cases where rational basis with teeth would apply and would be a basis to throw things out. Uh, your honor, with that, we would ask that the court reversed. Thank you. All right. Thank you both very much. We're in recess for today.